ESTATE OF MARY MARGARET MURPHY, DECEASED, JOHN FALK MURPHY, PERSONAL REPRESENTATIVE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3880–76.    Filed January 29, 1979.

*Thomas G. Ragatz*, for the petitioner.
*Scott R. Cox*, for the respondent.

## OPINION

FAY, *Judge:* Respondent determined a deficiency of $39,254.45 in the Federal estate tax of the Estate of Mary Margaret Murphy. The issue presented is whether the value of certain property over which the decedent possessed a power of

appointment is includable in her gross estate under section 2041(a)(3).[1]

All of the facts have been stipulated and are so found.

Petitioner John Falk Murphy (hereinafter referred to as petitioner or John) is the duly appointed personal representative of the Estate of Mary Margaret Murphy. At the time of filing his petition herein, petitioner resided in Madison, Wis.

Under the terms of his will,[2] Ross W. Harris (Ross), the father of Mary Margaret Murphy (the decedent), transferred certain property to the First National Bank of Madison, Madison, Wis., as trustee. The beneficiaries of the trust thus established (hereinafter referred to as the Harris Trust) were Ross' wife, Maude Johnson Harris (Maude), and the couple's two daughters, Josephine H. Schuele (Josephine) and the decedent. The terms of the Harris Trust provided that the trust income was to be paid in approximately equal shares to each beneficiary for her life.[3] The trust was to continue until the earlier of the death or remarriage of Maude. Upon the occurrence of either of these events, the trust would be terminated and the corpus distributed as follows:

One-half thereof to each of my daughters, Mary Margaret Murphy and Josephine H. Schuele if living, but if either of them shall not then be living the share of such Trust Estate to which she would have been entitled if living shall be paid and set over to such person or persons (not, however, including her own estate, her creditors, or the creditors of her estate), in such shares, and in such manner as my said daughter, by her last will, therein making specific reference to the provisions hereof, shall appoint and direct; but in the absence of her exercise of such power of appointment in the manner herein provided such share of the Trust Estate shall be paid and set over to those persons who, under the laws of the State of Wisconsin, would be entitled to take such property in the event of her death intestate on that date.

Prior to the termination of the Harris Trust, the decedent, on May 9, 1972, died testate. Under the provisions of her will, the decedent exercised the power of appointment over her portion of the Harris Trust. In so doing, she appointed one-half of her income interest in the Harris Trust to her husband, John, and

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect at the time of the decedent's death.

[2]The record does not contain the date of Ross' death but it occurred sometime around 1958.

[3]In the event that either Josephine or the decedent died prior to the termination of the Harris Trust, their respective income interests were thereafter payable to whomever each appointed by her will. However, Josephine or the decedent could not appoint their income interests to their respective estate, creditors, or creditors of the estate.

one-half to a new trust established by her will which was styled "MMM Family Trust."[4] She also appointed her corpus interest in the Harris Trust to the MMM Family Trust.

The dispositive provisions of the MMM Family Trust were also contained in the decedent's will. In this connection, the income from the MMM Family Trust was distributable to John as needed by him "to maintain himself in the manner of living to which he has become accustomed;" to the decedent's issue, under the discretion of the trustee; or, if not needed by John or the decedent's issue, the income was to be accumulated.[5] The MMM Family Trust was to continue for John's life and thereafter until the decedent's youngest child attained the age of 35.[6] At that time, the trust corpus and accumulated income were to be distributed to the decedent's children or lineal issue. In addition, the decedent's will further provided that:

Notwithstanding the other provisions of [the MMM Family Trust], if my husband, JOHN, survives me he shall have a testamentary power to appoint the corpus and any accumulated income as he may see fit among our lineal issue, the wives or widows of my sons, and the husband of my daughter; but such class shall not include my estate or my creditors or my husband's estate or his creditors.

On October 27, 1972, approximately 5½ months after the decedent's death, John formally renounced the power of appointment over the MMM Family Trust granted him by decedent's will.

Respondent, in a notice of deficiency mailed to petitioner on February 5, 1976, determined that the value of the property in the Harris Trust, with respect to which the decedent exercised her power of appointment, was includable in her estate under section 2041(a)(3).

As a general rule, property with respect to which a decedent dies possessing a general power of appointment,[7] is includable in his gross estate under section 2041(a). Conversely, where a

---

[4]Specifically, John was to receive one-half of the decedent's income interest in the Harris Trust for his life. If he died before the termination of the Harris Trust, his income interest was thereafter payable to the MMM Family Trust.

[5]The decedent's will also gave the trustee of the MMM Family Trust the power to sell any property not specifically devised or bequeathed.

[6]The number of decedent's children and their respective ages are not in the record.

[7]With certain exceptions, sec. 2041(b) defines a "general power of appointment" to mean a power which is exercisable in favor of the decedent, his estate, or the creditors of either.

decedent is the donee of a nongeneral or special power of appointment,[8] the value of his gross estate does not include the value of the property over which such power extends at the time of his death. An exception to this latter rule is found in section 2041(a)(3).

Because the rule against perpetuities (hereinafter sometimes referred to as the Rule) is so inextricably a part of section 2041(a)(3), before discussing that section and its requirements, and the question of whether they are here satisfied, it will be helpful to review briefly the purpose and operation of the Rule.

The principal purpose of the rule against perpetuities is to promote the free alienability of property by ensuring that its ownership is not suspended for an inordinate length of time.[9] Future interests which make uncertain, for more than the permissible period, the ultimate takers of property violate this objective by seriously impeding the power of alienation.[10] Hence, the rule against perpetuities evolved at common law to eliminate these impediments or so-called "fetterings of property."

At common law, the rule against perpetuities was a rule against the suspension of the power of alienation and against the remoteness of vesting.[11] A suspension of the power of alienation exists when there are no persons in being who can collectively transfer complete ownership of property.[12] If a future interest causes such a suspension for longer than the permissible period, the future interest is invalidated by the rule against perpetuities. Likewise, the rule against perpetuities voids future interests which may not vest within the permissible period.[13] In most instances where a future interest is invalidated under the Rule because the interest suspends the power of alienation for too long a period, such interest would also be rendered ineffective for remoteness of vesting and vice versa.[14]

---

[8]A "special power of appointment" is one which is not a general power as defined in sec. 2041(b). See n. 7 *supra.*

[9]5 R. Powell, Real Property 537, et seq. (1977).

[10]5 R. Powell, *supra* at 553.

[11]4 Restatement, Property, sec. 370 (1944).

[12]4 Restatement, *supra*, Comment i.

[13]4 Restatement, *supra*, Comment j.

[14]The most common example of an interest which causes no suspension of the power of alienation but which may not vest within the perpetuities period is one where A conveys land to B church to be held so long as the property is used for a parsonage, and thereafter to C and his heirs. There is no suspension of the power of alienation because B and C could unite and convey complete ownership of the property; however, C's interest may vest beyond the perpetuities period and is therefore voided under the Rule. See 5 R. Powell, *supra* at 588–590.

It is important to note that not all "fetterings of property" which suspend its ownership come within the Rule. It is only those fetterings which may last longer than the permissible period that are invalid.[15] The most common period during which fetterings are permissible is measured by some life or lives in being at the time such interest is created plus 21 years.[16] In the case of an interest in property appointed under a special power of appointment, the permissible period is computed from the date of the *creation* of the power.[17] For example, assume A dies and leaves property to B for life with the remainder to whomever B appoints by will; provided, however, that B may not appoint to his estate, his creditors, or the creditors of his estate; i.e., his power is a special power. Assume further that B dies and appoints the property to the children of C. To determine if the appointment by B is valid under the rule against perpetuities, it is construed as if A had died and left the property to B for life with the remainder to the children of C.[18]

Over the years some States have modified the permissible period by statute. In Delaware, for instance, the period of perpetuities for an interest appointed under a special power of appointment is computed from the date of the *exercise* of the special power rather than from its creation.[19] Thus, in Delaware it is possible for the absolute ownership of property to be indefinitely suspended through the successive exercises of such special powers. To illustrate this point, assume A died and left property to B for life with the remainder to whomever B appoints by will; provided, however, that B's power is only a

---

[15] Restatement, *supra*, Comments b and c.

[16] R. Powell, *supra* at 574.

[17] W. Leach, "Perpetuities in a Nutshell," 51 Harv. L. Rev. 638, 653 (1938).

[18] Further, when testing the appointment under the Rule, circumstances existing at the time the appointment is made are taken into account. W. Leach, *supra* at 654.

[19] The relevant Delaware statute provides:

Sec. 501. Powers of appointment; effect of rule against perpetuities.

Every estate or interest in property, real or personal, created through the exercise, by will, deed or other instrument, of a power of appointment, irrespective of:

(1) Whether such power is limited or unlimited as to appointees;

(2) The manner in which such power was created or may be exercised;

(3) Whether such power was created before or after the passage of this section,

shall, for the purpose of any rule of law against perpetuities, remoteness in vesting, restraint upon the power of alienation or accumulations now in effect or hereafter enacted be deemed to have been created at the time of the exercise and not at the time of the creation of such power of appointment. No such estate or interest shall be void on account of any such rule unless the estate or interest would have been void had it been created at the date of the exercise of such power of appointment otherwise than through the exercise of a power of appointment. [Del. Code Ann. tit. 25, sec. 501 (1974).]

special power. Assume further that B dies and exercises his power by appointing the property to C for life with the remainder to whomever C appoints by will under a special power; then C exercises the power in the same way and so on. Under the common law rule, the contingent interests which did not vest within the period of the Rule would be void; however, because Delaware law computes the perpetuities period from the date of the exercise of the special power, the Rule will not be violated. Absent section 2041(a)(3), the effect of the Delaware statute would be to permit the continual transfer of property from generation to generation without the occurrence of an estate tax.[20] Specifically, the donees each are given a life estate in the property which expires at their deaths and is therefore not included in their respective gross estates. Moreover, the remainder interest is not includable in their estates because under local law they do not own it and also because property subject to a special power of appointment is not taxed as part of the gross estate. To prevent this from happening, Congress enacted as part of the Powers of Appointment Act of 1951, section 811(f)(4) of the Internal Revenue Code of 1939, the predecessor of section 2041(a)(3).[21]

Section 2041(a)(3)[22] generally requires the inclusion in the

---

[20]W. Leach, *supra* at n. 37.

[21]The Senate Report accompanying the Powers of Appointment Act of 1951 stated in pertinent part:

"The new section 811(f)(4) deals with successive powers of appointment. In at least one State a succession of powers of appointment, general or limited, may be created and exercised over an indefinite period without violating the rule against perpetuities. In the absence of some special provision in the statute, property could be handed down from generation to generation without ever being subject to estate tax.

"Under section 811(f)(4) the exercise of any power of appointment created after October 21, 1942, will be taxable if it is exercised by creating another power of appointment which under local law can in turn be exercised so as to postpone the vesting of the property for a period which is ascertainable without regard to the date of the creation of the first power. This is true whether or not the first power is exercisable in favor of the holder of the power or his estate. [S. Rept. 382, to accompany H.R. 2084 (Pub. L. 82–58), 82d Cong., 1st Sess. (1951).]" .

[22]Sec. 2041(a)(3) provides as follows:

(a) IN GENERAL.—The value of the gross estate shall include the value of all property—

    \*        \*        \*        \*        \*        \*        \*

(3) CREATION OF ANOTHER POWER IN CERTAIN CASES.—To the extent of any property with respect to which the decedent—

    (A) by will, or

    (B) by a disposition which is of such nature that if it were a transfer of property owned by the decedent such property would be includible in the decedent's gross estate under section 2035, 2036, or 2037,

exercises a power of appointment created after October 21, 1942, by creating another power of

gross estate of the value of any property with respect to which the decedent by his will has exercised a post–1942 power by creating a second power. A further requisite to inclusion is that the second power, under the applicable local law, can be validly exercised so as to postpone the vesting of any estate or interest in the appointed property, or to suspend the absolute ownership or power of alienation of such property, for a period ascertainable without reference to the date of creation of the first power.

In the instant case, Ross Harris, the decedent's father, under the terms of his will, transferred certain property into the newly created Harris Trust for the benefit of his wife, the decedent, and the decedent's sister. In addition to a one-third income interest in the Harris Trust, the decedent's father gave decedent a testamentary power to appoint her portion of the income and corpus of the trust to anyone other than her estate, her creditors, or the creditors of her estate. Upon her death, the decedent, through her will, appointed the property subject to her special power to the MMM Family Trust. The decedent's will also granted to her husband, John, a testamentary power to appoint the corpus of her newly created MMM Family Trust to the children of the decedent or the spouses of those children. However, John could not appoint this interest to his estate, his creditors, or the creditors of his estate. Under the facts it is clear that the decedent by will exercised a power of appointment by creating a second power in her husband.[23] The issue presented is whether decedent's exercise of her power comes within the purview of section 2041(a)(3).

Petitioner's position is that section 2041(a)(3) was drafted to catch the successive exercises of powers which, under the local rule against perpetuities, could be validly exercised without regard to the date the first power was created. He argues that because Wisconsin expresses its rule against perpetuities in terms of a prohibition on the suspension of the power of alienation, and because the perpetuities period is measured from the date the first power is created, section 2041(a)(3) is not violated.

appointment which under the applicable local law can be validly exercised so as to postpone the vesting of any estate or interest in such property, or suspend the absolute ownership or power of alienation of such property, for a period ascertainable without regard to the date of the creation of the first power.

[23]Her husband's renunciation of this second power does not alter the fact that the decedent exercised her power by creating a second power. See sec. 20.2041–1(d), Estate Tax Regs.

Respondent's position and reasoning are as follows: In Wisconsin the statutory rule against perpetuities is concerned with the suspension of the power of alienation. Wis. Stat. Ann. sec. 700.16. Under this statute, an interest is void only if it suspends the power of alienation for a period longer than a life or lives in being, plus 30 years. Wis. Stat. Ann. sec. 700.16(1)(a). However, the statute also states that there is no suspension of the power of alienation when the property interest is held in a trust where the trustee has the power to sell the assets of the trust. Wis. Stat. Ann. sec. 700.16(2) and (3). In addition, remoteness of vesting is not prohibited in Wisconsin so long as there is no suspension of the power of alienation. *In re Walker's Will*, 258 Wis. 65, 45 N.W.2d 94 (1950). In the present case, the decedent exercised a power by creating in her husband another power which he, in turn, could validly exercise by placing the property subject to the power in a perpetual trust for the benefit of, for example, his children and their descendants. By giving the trustee of the newly created trust a power of sale over the corpus, the Wisconsin rule against perpetuities is not violated despite the fact that ownership of the property may never vest in anyone. From this, respondent concludes, section 2041(a)(3) applies to tax decedent's exercise of her power. He argues that Congress intended section 2041(a)(3) to function independently of State law. He maintains that the statute unequivocally indicates that if a power violates any one of three conditions of title, viz, (1) postponement of vesting, (2) suspension of the powers of alienation, or (3) suspension of absolute ownership, then the property subject to the power must be included in the gross estate. Therefore, he concludes, because the decedent exercised her power by creating in her husband another power which could be validly exercised to indefinitely postpone the vesting of any interest in such property, section 2041(a)(3) is applicable to include the appointed property in her gross estate.

While respondent's position may comport with a literal reading of the statute, apart from that it is without support in the legislative history, the regulations, and in the roots underlying the Rule at the time the predecessor of section 2041(a)(3) was enacted. We therefore agree with petitioner.

As previously noted, the common law rule against perpetuities was a rule against the suspension of the power of alienation and against remoteness of vesting. Also previously noted was the

fact that in most instances a future interest invalidated because the interest suspends the power of alienation for too long a period, would also be rendered ineffective for remoteness of vesting. At an early stage in American history, a number of States passed statutes modifying or abrogating the common law rule against perpetuities and substituting therefore a statutory rule against perpetuities.[24] The most significant of these statutory enactments occurred in New York in 1830. At that time, the New York legislature adopted legislation prohibiting the suspension of the power of alienation of real property and suspension of the absolute ownership of personal property.[25] This statute, which remained substantially unmodified until 1958, served as a model perpetuity statute for several other States.[26] Over the years, certain other States passed statutes expressing the rule against perpetuities in terms of remoteness of vesting rather than suspension of the power of alienation or of absolute ownership.[27] Still other States preserved, unmodified, the common law rule.[28] In 1951, when the predecessor of section 2041(a)(3) was adopted, there was anything but a uniform rule against perpetuities. A transfer valid under one State's rule might be invalid under another State's rule. Despite the lack of uniformity among the States, there were, nevertheless, two prevalent formulations of the rule which existed. On the one hand, there were those States which modeled their perpetuity statutes after New York's in terms of suspension of the power of alienation or absolute ownership; on the other hand, there were those States whose rule was expressed in concepts concerning remoteness of vesting. With this background in perspective, the purpose and choice of words used by Congress in section 2041(a)(3) becomes clear.

Section 2041(a)(3) taxes a power which is exercised by creating a second power which "under the applicable local law can be validly exercised so as to *postpone the vesting of any estate or interest in property, or suspend the absolute ownership or power of alienation of such property,*" for an impermissible period of time. (Emphasis added.)

[24]L. Simes, Future Interests 263, et seq. (2d ed. 1966).
[25]L. Simes, *supra* at 298, et seq.
[26]L. Simes, *supra* at 312.
[27]5 R. Powell, *supra* at 549–552.
[28]See n. 27 *supra*.

The language of the statute regarding postponement of vesting, suspension of absolute ownership, and suspension of the power of alienation, does not, as respondent maintains, provide for alternative conditions applicable in all cases. Rather, each condition of title is simply shorthand terminology for the local rule against perpetuities. Thus, section 2041(a)(3) taxes the exercise of any power of appointment if the donee exercises the power by creating a second power which, under the applicable local rule against perpetuities, can be validly exercised to effect the appropriate condition of title for longer than the permissible period. Accordingly, if the local rule against perpetuities is expressed in terms of remoteness of vesting, under section 2041(a)(3) we must determine if vesting of appointed property may be postponed for a period ascertainable without regard to the date of the creation of the first power. Similarly, if the local rule is expressed in terms of suspension of the power of alienation or absolute ownership, a determination must be made as to whether the prohibited condition may exist for longer than the permissible period.

Our interpretation of the statute is further supported by respondent's own regulations which provide in pertinent part:

(ii) If the power is exercised by creating another power of appointment which, under the terms of the instruments creating and exercising the first power and under applicable local law, can be validly exercised so as to (a) postpone the vesting of any estate or interest in the property for a period ascertainable without regard to the date of the creation of the first power, or (b) *(if the applicable rule against perpetuities is stated in terms of suspension of ownership or of the power of alienation, rather than of vesting)* suspend the absolute ownership or the power of alienation of the property for a period ascertainable without regard to the date of the creation of the first power. [Sec. 20.2041-3(e)(1)(ii), Estate Tax Regs.; emphasis added.]

Thus, under section 2041(a)(3), the exercise of any power of appointment will be taxable if the donee exercises the power by creating a second power which can be validly exercised so as to postpone the vesting of any interest in property, or "(if the applicable rule against perpetuities is stated in terms of suspension of ownership or of the power of alienation, rather than vesting)" suspend the absolute ownership or the power of alienation of the property for a period ascertainable without regard to the date of the creation of the first power. Hence, the question is whether the Wisconsin law of perpetuities, the applicable local law in this case, measures the period of

perpetuities from the time a general or special power is exercised or from the time it was created.

As previously noted, Wisconsin has by statute eliminated the common law rule against perpetuities and has substituted in its stead a rule against suspension of the power of alienation modeled after New York's statute. Wis. Stat. Ann. sec. 700.16(5); *In re Walker's Will*, 258 Wisc. 65, 45 N.W.2d 94 (1950). In pertinent part the relevant Wisconsin statute provides:

Sec. 700.16 *Perpetuities and suspension of power of alienation.* (1)(a) A future interest or trust is void if it suspends the power of alienation for longer than the permissible period. The permissible period is a life or lives in being plus a period of 30 years.

\* \* \* \* \* \* \*

(c) If a future interest or trust is created by exercise of a power of appointment, the permissible period is computed from the time the power is exercised if the power is a general power as defined in s. 702.01(4) even if the power is exercisable only by will; in the case of other powers the permissible period is computed from the time the power is *created* but facts at the time the power is exercised are considered in determining whether the power of alienation is suspended beyond a life or lives in being at the time of creation of the power plus 30 years. [Emphasis added.]

In the instant case, decedent's power was not a general power of appointment as defined in sec. 702.01(4), Wisconsin Statutes,[29] and is therefore governed by the second clause of subsection (c) of the Wisconsin statute set out above. Under this clause the perpetuities period is measured from the date the first power is created. Since a requisite of section 2041(a)(3) is that under the applicable local law the perpetuities period on the second power is computed from a date ascertainable without regard to the date of the creation of the first power, the statute has no application in this case. See A. Casner, Estate Planning, pp. 675, 710–711 (3d ed. 1961).

To hold otherwise would have the undesirable effect of indirectly imposing upon one State the rule against perpetuities of another State. In other words, the conditions of title which appear in section 2041(a)(3) are not defined in the Internal Revenue Code. They are, as stated above, various State law formulations of the rule against perpetuitites, and therefore, we

---

[29] Wis. Stat. sec. 702.01(4) provides in part:

(4) "General power" means a power exercisable in favor of the donee, his estate, his creditors or the creditors of his estate, whether or not it is exercisable in favor of others. \* \* \*

must look to State law for their meaning. Because of the many statutory variations of the Rule, a transfer by appointment may comply with one State's rule on suspension of the power of alienation and yet violate another State's rule against remoteness of vesting. In this instance, a literal reading of section 2041(a)(3) would tax the exercise of the power of appointment. As a result, draftsmen would be held to a standard requiring them to avoid creation of conditions of title considered objectionable in States other than their own.[30] This interpretation of section 2041(a)(3) would ignore the evolution of the Rule throughout the various States and extend its reach well beyond that intended by Congress. Indeed, the Senate Report[31] accompanying the predecessor of section 2041(a)(3) in referring to a situation in "at least one state" indicates to us that Congress did not intend the application of the statute to be so broad in its scope.[32]

Respondent asserts that acceptance of petitioner's position would leave open to individual States the ability to circumvent section 2041(a)(3) by enacting laws similar to those in Wisconsin. Aside from the fact that we think it unlikely that States would take such steps to upset established local property law, any potential for abuse in this area would better be curbed by Congress. Indeed, without deciding the question at this time, through passage of the generation-skipping transfer provisions in 1976,[33] it would appear that Congress has already acted, albeit indirectly, to close the loophole perceived by respondent in this case.

Accordingly,

*Decision will be entered for the petitioner.*

---

[30]It might be argued that Congress intended to use the common law rule against perpetuities as a touchstone in sec. 2041(a)(3). However, while it appears that Congress, through sec. 2041(a)(3), sought to encourage compliance with that aspect of the common law rule which measures the perpetuities period from the date of a special power's creation, it is far from clear that Congress intended to also force compliance with all aspects of that rule. Indeed, assuming we could define a universal common law rule, acceptance of this approach would likewise have the ill effect of imposing the common law rule and all its mysteries in the many States which have statutorily modified the common law rule to alleviate some of its more arcane aspects. We think Congress did not intend such a result.

[31]See n. 21 *supra.*

[32]That is not to say that the statute has application in only one State; rather, we are merely stating that we do not think Congress intended it to operate as extensively as respondent argues here.

[33]See secs. 2601, et seq., I.R.C. 1954, as amended.